The next matter which is United States of America v. Miguel Ortiz. Mr. Goldberger May it please the court, my name is Peter Goldberger. And it's my privilege this morning to represent Miguel Ortiz, who was the defendant below. I'd like to reserve two minutes of my time for rebuttal. Go ahead. You're going to have to yell a lot in two minutes, it seems to me. Two minutes is not a long time. It seems to work. It depends on how we read the clock here, as you know. Yes, I know what you mean. Miguel Ortiz was convicted after trial of conspiring with Nelson Rodriguez to distribute cocaine and then to launder the proceeds of that conspiracy by gambling at Philadelphia casinos. The trial court committed two significant and prejudicial errors in admitting evidence, which require reversal and a new trial. The first that we address in the brief, but not the first I'd like to argue, is the use of secondary evidence of video surveillance of one side of Nelson Rodriguez's cocaine distribution warehouse after the primary video evidence was inadvertently destroyed in a computer mishap. The second significant issue is error in admitting evidence of a large cash seizure in June of 2010, which the district court wrongly allowed under the doctrine of intrinsic evidence. I'd like to take that second point first. All right. And I'll be interested in how you address U.S. v. Green in terms of whether or not it's intrinsic. I thought it was a guess on my part that you would. The court well knows the doctrine of intrinsic evidence because it was clarified and narrowed so significantly in the Green case in 2010. And one of the things, one of the many interesting and useful things that we learned from Green is that you can't evaluate whether evidence directly proves the crime charged, which is the strict definition of intrinsic evidence, without reminding yourself exactly what was charged. This came up in Green itself when the court focused on, what does the indictment say was the crime there in a particular attempted distribution of cocaine? Here, the charge is a conspiracy defined as the Nelson Rodriguez drug trafficking organization. The charge here is not some kind of vertical conspiracy that leads up and back to somewhere in Mexico or South America through levels of distributors and smugglers. The charge, the conspiracy is one centered on Nelson Rodriguez and his distribution of cocaine from Jasper Street in Kensington to Philadelphia. And Rodriguez paid Ortiz $1.9 million on three days in early June. Correct. June 4, 7, and 8. Of what year? Is that 2010? 2010. Right. So on June 4, 7, and 8, Rodriguez pays Ortiz $1.9 million. And then on the 8th itself, $2.1 million is seized. Those are the facts that underlie this issue. That's right. We don't know for sure that there's connectivity between the $1.9 and the $2.1. I mean, the $1.9 wasn't handed over at the truck where the truck was seized. Right. But why isn't at least an acceptable inference to have been drawn that that money was connected? It has primitive value for that purpose, doesn't it? And that's where the district court principally went was what three points persuaded him that there was a connection shown between the seizure of the money and Miguel Ortiz and to a lesser extent between Miguel Ortiz and the Rodriguez business. My point, which is actually where I was starting, is actually a step prior to that, which is that the role of Miguel Ortiz as supplier to Nelson Rodriguez is his role in the charged conspiracy, looking at what we mean by intrinsic evidence, where the loading of money onto the truck to take away is no longer part of the Nelson Rodriguez conspiracy. This is now the first step of being outside that conspiracy. The distributor distributes drugs to the person who is the center of the charged conspiracy. That's deemed to be part of the conspiracy, along with his other supplier, and he gets paid. Assuming this is Ortiz now, and I do want to get back to your question, his underling goes away with the money, or he goes away with the money, and some underling later goes and meets a truck to take that money somewhere else. This is not being done for Nelson Rodriguez.  This is Ortiz dealing with the unknown other person who is supplying him cocaine from California. This was supposed to be 75 kilos. Until you get back to the farmer somewhere, everybody has somebody behind them or above them. But the point you're making is that there's no evidence in the record to suggest that the 75 kilos that was being purchased with the $2.1 million had anything to do with Rodriguez. Right. In fact, the government disavowed that position in the district court, although they try to bring it back in their brief here. So that's outside the strict green definition of what it means to be intrinsic. But even if you get beyond that, only if you get beyond that, do you get to the three points that Judge Du Bois accepted from the government's argument, and those points are very weak. But what about green? I think this language is taken from green, that we consider two types of evidence intrinsic. Evidence that, quote, directly proves the charged offense. Let's set that aside. But what about the next one? Uncharged acts performed contemporaneously with the charged crime if they facilitate the commission of the charged crime. Why couldn't that? Let's assume that everything you've said is correct. The 75 kilo source had nothing to do with Rodriguez. Why doesn't the behavior still fit within that second point? That is a quote from green. Because, again, the supplier, who is on the outer edge of the charged conspiracy, taking his money away to pay his supplier or invest in real estate or go gambling or whatever, is not facilitating Rodriguez's distribution of cocaine in Kensington from that warehouse. Any more than Rodriguez's underling, who sells cocaine on the corner when he goes and pays his rent, is facilitating the Rodriguez conspiracy. Each person connected to the conspiracy then has his own life and his own activities, and not all of those activities are part of the conspiracy in the strict intrinsic sense. It becomes something logically relevant, interesting, part of the story, just the things that we used to call res gestae but do not call intrinsic anymore. And that's the error. The weakness of the connection to Ortiz was you only get to if you believe it's intrinsic. And that is some similarity in the amounts of money, but it's not the same amount of money. And then two statements by Ortiz quoted by Rodriguez, the same highly unreliable witness who the jury believed, that is the kingpin who is testifying to save himself from a mandatory life sentence. So this is not somebody testifying, underling testifying against the kingpin. This is the kingpin testifying and saying Ortiz told me sometime later, because of the truck seizure, the truck seizure, I think the the is in the government's favor here, the truck seizure, I'm going to go away and lay low for a while. And then the fact that, again, Rodriguez says Ortiz didn't sell drugs to him for the next several months, he had to get his drugs elsewhere. Mr. Goldberger, because time is of the essence and you've raised several other issues, I wonder if you want to address the harmless error side of the Green-related issue before moving to the other issues. Any argument that this evidence would have been harmless in the context of the whole case is a very weak one, and certainly not one that the government can bear its burden on such an issue that was aggressively objected to in the district court. We don't have any burden. They have the burden to show that the error was harmless, that it's not reasonably likely that it would have affected the jury's verdict. And here what we have, as I was kind of saying before, is we have witnesses of dubious reliability giving the primary evidence that ties Ortiz. into this conspiracy. And there's a reason why Rodriguez could name him. He's related, they're cousins of some sort. And the agent testimony is seeing Ortiz drive around and on one occasion seeing him. They have these video cameras set up, and this actually ties to the other issue, that look at the front and the back of the warehouse. On one video, one agent says, I can identify Ortiz being the one who is driving that truck in, but unless you've been following him around and investigating his case for months, you, members of the jury, you wouldn't be able to see that it's Ortiz. The quality of this video is such, that could be a kangaroo, says the agent. That's actually what he said as far as the jury is concerned. The jury didn't buy it, did it? Sorry? The jury didn't buy it. No, no, of course. It was the kangaroo. And not only the defense either. But the fact that the jury convicted hardly proves that the error was harmless. In every case that comes up with this issue, there has been a conviction.  Let's move to whatever your next issue is. Yes. All right. So the next, the other issue relates to these cameras, right? So the cameras are up for several weeks, taking pictures of the front and the back of the warehouse, trying to catch who's going in and who's going out. There are two sides of the warehouse. There are two cameras, one on each side. Let me interrupt you here, because what I have been trying to figure out as I've grappled with that issue, even initially in reading your brief, is how the effect here on a jury, how the effect, just in terms of the law of evidence, is any different from the testimony of a percipient witness who has viewed an event without the aid of some kind of recordation. Yes. There's never been a recordation. There was in this case, but for some reason the government lost the videos. So the agents testified what they saw on the videos. What's the difference? That's the first point the government makes in their brief, and we address it head on in our reply brief. The difference between a human being perceiving a scene and a human being telling the jury what he has seen looking at a video is very different. Well, I know it's different. That's obvious. That doesn't tell us anything. Why doesn't it go to wait? Yeah. Isn't that just a wait thing for yourself to say, look, this is different than eyewitness. He's not sitting there in a car in the corner watching these guys. He didn't get a good look. He's looking at a grainy video. We're not saying it was illegal under Rule 1004 to allow this testimony. We're saying it needed these protective qualifications that Judge Du Bois wisely assigned in his pretrial motion and then didn't enforce a trial. That is to say that in order to level the playing field, to level that playing field, agents should only be able to testify about viewing the video. They're not testifying about what they saw with their own eyes, except seeing the video with their own eyes, right? But they should be able to testify only as to the alternate weeks when in viewing the video they took notes and made reports because Judge Du Bois' finding was they watched so many hours of video for so long that they could not in a 403 sense. But that still gets us back to the question of why it's different. People who perceive events transpired don't necessarily take notes. Yes, but the agents admitted that they could not remember most of what they saw without referring to their notes. And the judge required that they then testify only about matters about which they had notes, which wasn't adhered to at trial, and that they limit themselves to what they themselves saw. I thought that was predominantly adhered to at trial, except in limited instances where that witness said, perhaps somewhat incredibly, no, I remember seeing this, but wasn't that the testimony? That's true. So what can we do about that? I have to admit, when I read that, I thought it was a little incredible, but I wasn't the trial judge making that call, and how can we upend that? Because there's a Rule 403 filter through which this testimony comes before it even gets to the jury. The rules of evidence tell us that the trial judge does have a gatekeeping role under Rule 403. Right, but it would have been fine if it had been enforced according to the rules set forth in pretrial, but not the way it happened, which was also, I'm sorry. No, go ahead. I just wanted to say, the other safeguard was that the agents should meticulously adhere to Rule 602 and the hearsay rules and limit themselves to what they themselves perceived in viewing the video and not what they were told by the members of their team. And yet the agents think like a team, they talk about we at the trial, and they didn't adhere, and the judge didn't enforce, despite expressing annoyance at it, did not enforce that rule to protect the jury from this unduly prejudicial and confusing but yet unfairly prejudicial evidence. But on the 403 issue, isn't it the case that once the trial judge admits or determines that the officer has credibly stated that through his own recollection, I saw this, the 403 balance, you almost have no argument on the 403 once that decision is made. If I'm not mistaken, the judge has only made a 403 ruling in the pretrial motion, and it was a summary ruling that this court could review de novo under the string of cases that both sides have cited. At trial, he just said overruled on those points. He said overruled after the witness said, I remember seeing this. I don't need a video, I don't need a note, I remember seeing this. And the defense lawyer says objection. Because we've gone beyond the time, we should quickly turn to your sentencing issue if you wish to address that. Well, if you would indulge me. We will indulge you for a moment. It's really a pretty simple issue. In imposing sentence, the judge says, I'm imposing a sentence which is a lot less than a life sentence, and it wasn't a lot less than a life sentence. What was the big misapprehension? About the measurement of time that is represented by a 30-year sentence imposed on a 46-year-old man with diabetes, and a life sentence, that is to say, a sentence which in either event will require that he die behind bars. And the government says, oh, he didn't mean, he meant something else by a lot less than a lot less time, but we don't know what it was, and that doesn't help them because... Your argument really relies or is dependent upon probabilities, isn't it? I mean on life expectancy. Life expectancy is a 50% probability, that's right. So, isn't there a difference qualitatively between the imposition of a life sentence and the imposition of a sentence term of years? Qualitatively. For a male man. So, yes. And if there is, then can't we read this sentencing transcript as certainly suggested that the court made no error here at all. What he saw as a difference between the two sentences was not dependent upon the probabilities that you rely upon, but rather dependent upon the qualitative difference between a life sentence and a term of years. If that's what he had said, there would not be an ambiguity, but he didn't say that. You just think, your position is that he should have said that. And there are terms of years which are not qualitatively different, I should say, that a judge could impose a sentence of a hundred years. If I am correct, and that is a legal proposition, and in fact when that struck me as being really the major factor at work here, I asked my clerks to see if they could find any law and they came up with a First Circuit case that says just that. So, if we accept that as a legal proposition, why does the court have to say it? Can't we simply presume that he relied upon that qualitative difference? That was the basis for his distinction. I don't think that the law of sentencing in the Third Circuit works that way. I don't know that we have said that. The judge's explanation has to be free of significant ambiguity, and here it was not at best. But it is true, is it not, that the judge was fully aware of your client's medical condition? Yes. Okay. Yes, it was presented to him. He acknowledged that it was sentencing, and he said, I'm not varying from that. He said it in one sentence, but he said it. That's true. All right. Thank you very much, Mr. Goldberger. We'll have you back on rebuttal. Two minutes. Ms. McKillop. May it please the Court, my name is Emily McKillop. I represent the United States of America in this case. As Mr. Goldberger did, I would like to address the second of the two issues first, which is the seizure of the cash. Why doesn't he make a compelling argument when he says that, look, this truck with 75 kilos of cocaine that's seized in Missouri is not tied in any way to the charged crime, namely the Nelson Rodriguez drug group? Your Honor, Mr. Ortiz's counsel takes an unwarrantedly restrictive view of the conspiracy. The indictment charged an ongoing conspiracy from 2008 through 2011. That conspiracy involved multiple, very large deliveries of cocaine by Ortiz to Nelson Rodriguez. Mr. Rodriguez parceled it out among his customers, received payment from them, passed payment on to Mr. Ortiz, who then gave him another load. And that's the conspiracy charged in the indictment? I haven't looked at the indictment for so long. The indictment is rather brief. It charges that there was a very long conspiracy. Temporarily, what does it say? 2008, and I forget whether it's specified as a month in 2008. Through 2000, Mr. Rodriguez was arrested on, I believe, March 29th of 2011. So that would be the end of that conspiracy. So it is a period of years. Mr. Rodriguez kept quite thorough records of loads coming in and money coming in and then being paid to his suppliers. It shows that this one truck that was stopped was by no means the only truck that was involved in this case. There were hundreds of kilos delivered at different times. It begs the question as to whether the truck that was caught in Missouri had cocaine that was bound for Rodriguez. Maybe Ortiz was supplying cocaine to five other guys in the area. And in fact, Your Honor, that is why the cocaine was not introduced into evidence. But how does the money become intrinsic? Just humor me for one minute. Let's assume that that truck with 75 kilos seized in Missouri was bound for a man in Patterson, New Jersey, named Jones. Okay? How can that $2.1 million that was supposed to be payment for Mr. Jones' cocaine, how can that be deemed intrinsic to the Rodriguez conspiracy? Your Honor, I'm shaking my head because it was not payment for Mr. Jones' cocaine. It was payment for previous loads of cocaine supplied by Mr. Ortiz's supplier. What did you offer by way of evidence or proffer to support that? It is the ongoing nature of the conspiracy. Mr. Rodriguez testified and his tally sheets show he was fronted cocaine. And it is certainly reasonable to assume that he was fronted cocaine. Mr. Ortiz was fronted cocaine by his supplier. And, Your Honor, it is actually not necessary that this money be tied to a payment for a particular load. We suggest that the circumstances of this particular delivery suggest that it was payment for a previous load that had been fronted to Mr. Ortiz. Whether it is or not, what this evidence does is place Mr. Ortiz in possession of a very large quantity of money that is very close to amounts that Mr. Rodriguez backed up by his tally sheets says he paid to Mr. Ortiz on the 4th of December. If we look at this record and say that it's pretty clear that the $2.1 million was Rodriguez's money, that's the end of our analysis for purposes of intrinsic... Yes, Your Honor, because it is intrinsic to conspiracy to distribute drugs that if you want to keep going with the conspiracy, which these parties clearly did, you pay your debts. And Mr. Rodriguez testified, and I'll get to the point about Mr. Goldberger attacking his credibility in a moment because that is relevant, but he testified he made these payments. They're backed up by the tally sheets. If we can then show, and the district court found that the evidence was sufficient for the jury to find, that a person who was an agent of Ortiz was in possession of slightly more than that amount of money, but essentially the $1.9 million, within four days of the initial payment being made, that is corroboration of Mr. Rodriguez's testimony. The money is intrinsic to the conspiracy because it is money paid by Rodriguez to his supplier for cocaine previously supplied. Now, Your Honor, how is that linked to Ortiz other than through Mr. Rodriguez and his tally sheets? It is Mr. Ortiz's own statement in the summer, and the seizure was undoubtedly in June of 2010, early June. We have some quibble about whether June is considered summer. Technically, of course, it is before the solstice, but I think Your Honors have probably... It depends on whether you live in Montana or the rest of the country. Summer starts a different time. I always think of summer as starting after Memorial Day, but in any case, in the summer, Ortiz phones Mr. Rodriguez, makes an effort to reach out to Rodriguez, and says, I'm going to take it easy, as in stop supplying me with cocaine, because of the money that was seized from the truck up on 95. And then he backs that up by... By actually, he's as good as his word. He ceases to do drug business until the following December. He went to Puerto Rico for some months, right? He does, but there is also evidence that when he was in Puerto Rico before the business continued, both Mr. Ortiz and Mr. Rodriguez went to Puerto Rico from time to time, and others working for them continued the business. Whether he went to Puerto Rico to lie low after the drug seizure, there's nothing in the record. Conceivably, he did, but Mr. Goldberger suggests that, well, the seizure of the money was so upsetting that the entire drug dealing community shut down. That's not supported by the record, Your Honor, because Mr. Rodriguez testified in his tally sheet show that his other supplier, Primo, whose name unfortunately I forget, oh, I believe it was Mr. Jesus Rivera, who's the fugitive co-defendant, continued to supply Mr. Rodriguez, even though this truck had been ceased. So clearly, it didn't put everybody else off their stride. It was Mr. Ortiz who was particularly concerned about this truck that had been stopped. That is evidence that ties Mr. Ortiz to that money. It puts him in constructive possession of this very large amount of money that is backed up by the tally sheet. It is evidence that proves the conspiracy that Ortiz supplied Rodriguez with cocaine. Rodriguez sold it. Rodriguez then paid Ortiz the very large quantities of money that he owed him for this cocaine. How did that money, how was that distributed? I wonder how he made a payment of, was it $2,000? You're referring to the money in connection with the truck seizure? Yes. And I apologize, Your Honor, I do not have the specific amounts that were paid on each day. But there were payments made by Rodriguez to Ortiz on June 4th, June 7th, and June 8th. Those payments totaled $1.9 million. Then the money was seized with the truck stop on June 8th, on the very same day. And I would point out, just incidentally, it's not a point on which the district court placed a lot of weight. That money was delivered to the truck. It was in a garbage bag, but inside it was a duffel bag. And reading the record of the evidence in this case, Mr. Ortiz used duffel bags. He used them to deliver the cocaine to Mr. Rodriguez. He never got it back. Mr. Rodriguez tossed him in the corner. The seized warehouse was raided, placed in evidence before a jury, as were pictures of the duffel bags in which the money was transported. Did Drini testify that that was Ortiz's money? I don't believe he did. Not directly, no. I'm looking at the appendix 24. It's my understanding that Drini learned from a cooperating witness that the 2010 seizures captured Ortiz's money and drugs. But I can't remember if he actually testified to that. He didn't, Your Honor. That was a preliminary hearing. There was a discussion about why this blew up shortly before trial. It was because a cooperator made that comment. So all you have to go on, really, is the circumstantial evidence. And your argument is that, look, this is pretty strong circumstantial evidence. If you've got $1.9 million paid on the 4th, the 7th, and the 8th, and the seizure of $2.1 million on the 8th, do the math. And the phone call. The phone call and the fact that Ortiz made. And the phone call made in Mo. Made in Mo. And it doesn't even need to be particularly strong. This is a low standard. The judge merely needs to find that the evidence was sufficient for a reasonable jury to find, by a preponderance of the evidence, that this occurred. Because in here we're looking at Rule 104 of the Rules of Evidence, which talks essentially about finding a fact that is necessary to the relevance of evidence. But that doesn't answer the question of whether it's intrinsic or not. But you're saying it's intrinsic because it was Rodriguez's money. It was Rodriguez's money paid to Ortiz, and then Ortiz essentially claimed ownership of it by making this phone call and then ceasing his very lucrative drug business in Philadelphia for about six months. He really put his money where his mouth was on that one, Your Honor. It may be intrinsic because it is directly to defense. It may be intrinsic because it is an action that was contemporaneous with the conspiracy and facilitated the offense. But the district court was clearly correct in finding that it was intrinsic evidence of sufficient value to enable the jury to consider it. That's the only standard we have here, and really this court's standard is whether that was an abuse of discretion. Ms. McKillop, let's turn to the other evidentiary issue that Mr. Goldberger presses. Okay. Your Honor, with regard to the Paul Kim testimony, I would suggest that Mr. Goldberger very much overstates what the district court ordered. And, of course, I'm not going to belabor that because my time is running out. I would assume that the government would be saying, we don't know what Mr. Goldberger is complaining about. He was better off not to have this video evidence at trial than he was actually going to trial with the government with video in hand. I think that's very probable, Your Honor. Certainly he had a little bit of video, which he needs. But it's the critical period of time where some of the videos were missing. Exactly. But because he had this one very grainy image, he could then argue to the jury that all of this footage was of equally poor quality, and therefore the agents couldn't possibly have seen what they claimed to see. It did not hurt him. Your Honor, the government is in total agreement with your perception that there's really no difference here from the testimony of any percipient witness. What about the argument that the trial judge didn't quite adhere to the rulings that were made pretrial, and it sort of got away from him during the conduct of the trial? That was the January 28th testimony of Agent Pedrini. And what the court ruled, we can argue back and forth about, was this a different position than it stated in the order or not? But what the court ruled was this witness may testify to his own perceptions if he has an independent recollection of them. He asked the government to lay a foundation. The government proceeded to ask the relevant question of Agent Pedrini. He testified, yes, I did look at the footage on January 28th, and yes, I do have an independent recollection. Now, defense counsel could have, and to some extent did, but he could have tested that by cross-examination, and if he really wanted to complain about it, that's what he would have done. Your Honor found it perhaps somewhat incredible that Agent Pedrini actually remembered one day. The only reason I say that is because there was a lot of surveillance here. This was months. Your Honor, for almost any other date, I would agree with you, but this was January 28th, 2011. That was a humongous date in the course of this investigation, although the jury didn't hear about it. That was when the other truck was stopped. Now, that truck, which had, I can't remember if that was 75 kilograms of cocaine, it was an equally very large amount. Same deal, a money transfer of, I believe that was $2.3 million. Agent Pedrini was actually on live surveillance and saw Mr. Ortiz's truck. I can't remember off the top of my head whether he saw Mr. Ortiz to recognize his face, but he saw at least Mr. Ortiz's truck meet with the tractor trailer. That's a very big day, and if someone, if he's watching the footage for January 28th and sees Mr. Ortiz at the warehouse, he's going to say, oh my gosh, that's the same day, so we have footage of him at the warehouse on the same day that we have this huge truck. Okay, that's a jury argument, Rick, isn't it? I mean, there's reason for the witness to have remembered this date. Absolutely, but this was before the district court. The district court had extensive hearings that resulted in the suppression of that particular truck seizure due to the use of a GPS, and of course, should this case return to the district court, we will argue that that evidence is in fact admissible. Your Honor, I see my time is up. Are there any other matters?  Your Honor, we're fighting over the use of the words a lot. I believe that Mr. Goldberger has characterized, I don't know that I heard him invoke the term an argument, but I believe he has characterized this as really having due process implications, this apparent or alleged contradiction in what the district court said. How would you respond to that? Your Honor, a fair reading of records shows that the district court knew exactly what it was doing. This was a variance. The district court granted a variance. The district court also stated… Granted a variance from what would have been life. Well, what if the life down to 30 years? Clearly, the judge devised a term of use as a considerable difference from a life sentence. In theory, that's true. But if we look at the actuarial tables, it was actually no different than life. Your Honor, I'm not familiar with any case in which courts have actually been required to follow actuarial tables. His point is that he made a misstatement of fact. That's what I understand his point to be. Whether 30 years is a lot less than life. For somebody in that condition. I'm pretty sure if you ask defendants if they'd rather 30 years or life, they're going to take the 30 years. They're going to take the 30 years. They are going to perceive that difference. But on the specific facts of this case, in light of this man's condition, do you admit, do you not, that his life expectancy would have caused him to die in jail? I can't make that prediction, Your Honor. He had type 2 diabetes. Many people have type 2 diabetes. It's a condition that is actually fairly well managed. Now, would that actually reduce his lifespan? Well, but that's not really the issue before us, is it? The issue before us is did the district court err here? Did the district court do something that departed from what he had intended? Right? I mean, isn't that what you're saying? And the government's answer to the fair reading of the record shows no. The district court rejected the argument based on the reduced lifespan, branded a variance. The district court clearly viewed the term of years of 30 years as a lot less than life. There was no mistake. There was no misapprehension. It was a lawful sentence. There is something reminiscent about these facts, about this situation of an old Woody Allen movie, I believe it was Love and Death, and Woody was sitting in a cell contemplating his impending execution. He said that, you know, I'm sitting here, I'm scheduled to be executed at 6 a.m. It was supposed to be 5 a.m., but I had a good lawyer. So I think as a practical matter, 30 years may be viewed by someone as a little better than life, but we'll hear from Mr. Goldberger in response. I'm going to try to resist the temptation to spend my two minutes telling you about clients who have died in the Federal Bureau of Prisons from neglect of their diabetes. It's a well-managed illness in other settings. The question that Judge Hardeman raised about this being Rodriguez's money, or whether this was Rodriguez's money, goes right to the heart of my point about why it isn't intrinsic. Let's assume that it was money given by Rodriguez to Ortiz in payment of cocaine. It was Rodriguez's money until it was given to Ortiz. Then it was not Rodriguez's money anymore because Ortiz, on the government's theory, is not a courier for Rodriguez taking this money to pay a supplier or pick up another load. He, Ortiz, is the supplier. You have to put it out of your mind this is a drug business and think about it as a business as defined, and the business as defined as the conspiracy and the indictment. And that conspiracy is the Rodriguez conspiracy. When Ortiz takes the money away, presuming that to be the fact, it's then his money, not Rodriguez's money, and it's outside the conspiracy as defined. What about the evidence of consignment, though? Isn't that a fair point that Ms. McKillop makes? If you infer that this is a consignment operation, then $2.1 million is being reimbursed for cocaine that's already been distributed to Ortiz to Rodriguez. Yes, that's right. That's right, and that transaction ends when the money is paid. And if there's another load coming, then it will be fronted, as they say, around consignment. But Ortiz hasn't paid that money to the principal source until... But this is my point exactly. Whatever relationship, assuming the facts again to be in the government's favor, the relationship between Ortiz and his higher source or outside source is not the Rodriguez conspiracy. That's what I'm saying. That is not part of the Rodriguez conspiracy. And it doesn't facilitate the Rodriguez conspiracy? I'm concerned again about that language from Green. I'm sure that language was not intended to completely undermine and destroy the entire point of the opinion. By allowing the government to argue it as being, oh, we can always argue that, and that destroys the edges that Green drew around the charge defense. Now, the language does say if it facilitates the commission of the charge crime and... You can't turn that into relevant to the story or you've destroyed the meaning of the line that Green was drawing. So I think I have one other point and I'm done. Thank you. Thank you very much. We'll let you briefly make the other point. Well, it was about your point, Your Honor, Judge Smith, about... Nothing to do with Woody Allen. No, I actually usually only use take the money and run argument purposes. That's for bank robbery cases. Yes. The defense is not... My only point is the defense is not better off with the jury seeing a video that you can hardly make out than in having agents who are trained to testify as persuasive... With their terrible memories and perceptions are subject to cross-examination. Why not a better shot? Giving their interpretation of what they say they saw on the video. That's what I'm saying. That's why it's not better. All right. Thank you. All right. Thank you very much. A well-argued case. We will take it under advisement.